Good morning, Your Honors. Can you hear me? Carolyn Chan from Louis, Brisbane, Biscard & Smith. I represent the Appellant Telemasters in this case. I'd like to reserve five minutes for rebuttal time, if I may. In this case, the jury unanimously awarded $698,000 as to all four causes of action. And we don't have a problem, or Telemasters does not have a problem, with the District Court's finding as to liability. Our problem is with the Court's failure to respect the jury's determination of damages. In particular, the Court, when it ruled on the Defendant's Rule 50b motion, placed its full focus on the conversion claim. And cut the award by over 90 percent. The Court essentially gave short shrift to the remaining three causes of action. It gave no proper reason for disrespecting the jury's decision to award such damages. But what is your theory, let me understand, how was your client entitled to almost $700,000 in damages? I mean, this is a big reduction. Yes. Yes. So what is the basis for the jury's award? The basis for the jury's award, based on all four claims, is that what you're asking? The jury awarded $698,000 as to each of the four claims. Each of the claims. Yes. And what was the value underlying that? The value underlying that is the undisputed evidence, the testimony of Mr. Paul Phillipson, who testified that the value of the PBX system was worth approximately $600,000. The value of the system was $600,000. Did he testify that that was fair market value, that he could sell it for that? I'm sorry, Your Honor? Was that fair market value, he could sell it for that? I think that when you look at the – it's hard to say, Your Honor, but I think that when you look at the context of the reporter's transcript, the judge gave this lecture as to fair market value, must produce damages of fair market value, et cetera, et cetera. And then Mr. Phillipson was questioned as to the amount, and he – that's what he testified to. He testified that the system itself was worth much more than the sum of the parts, and it was worth approximately $600,000. There was another witness. What was the basis for that valuation? I'm sorry, Your Honor? What evidence did he have that it was – he said that. Yes, Your Honor. He's not an expert. He was not designated as an expert. That's correct, Your Honor. So did he have comparable sales of similar systems on the market? I don't believe the record shows that he has comparable sales of systems on the market, Your Honor. But it was just his testimony that it's worth that. Well, it's his testimony based upon decades of experience in the industry. I think the record shows that when – back in 1993, when the Vintage Club first sought bids for this sort of telephone system, which includes automatic phone switching and personalized voicemail, et cetera, et cetera, for 2,300 phones in this exclusive country club, that there weren't a whole lot of bidders for this type of work. There was one – I believe it was GTE or one of the major phone companies, and it was way, way, way too expensive. And that's when Mr. Philipson and his partner – then-partner, Ms. Snowden, came to Vintage Club and said, hey, we can do this for much cheaper. And that's based upon Mr. Philipson's years and years of experience with the industry, his years and years of experience in programming and creating and producing such telephone systems. Okay. So you say the district court focused unduly on the conversion claim. So it would be helpful to me if, in simple terms, you could explain exactly what it is that you think would support a $600,000 figure on a breach contract claim. Just start there. Okay, Your Honor. I'd be happy to. So what you're saying is – Well, that's your position. Yes. That's our position. And so all I'm asking is precisely upon what do you base your argument that the evidence would support upwards of $600,000 on a breach contract theory? I understand, Your Honor. The evidence, again, would point to Mr. Philipson's testimony that the system was worth more than the sum of $1,100,000. Okay. Let's just say – let's – at least let me give you my view. Okay. That's just worthless. Okay. For him just to say out of the air, the system is worth more than $600,000. The PBX was the greatest part of the value of the system, and they got the PBX back. So right there, you're way off of a $600,000 figure. So on the – I mean, putting aside conversion, on the breach of contract theory, what did they breach and what was its worth on the market? Your Honor, it may be true that the PBX is worth a substantial amount of money, but we submit that more important to the system than the PBX is the translation card. All right. Now, on the translation cards, if I understand it correctly, there is no evidence at all of a fair market value for starters. So that's one basis upon which to discount any value attributed to the translation cards. But if I also understand it right, the argument has to do with whether you even owned it or whether that was passed – ownership of the translation cards was passed to Vintage through the contract. So what was the breach of contract there other than intellectual property, which is not at issue? We submit that when you look at the language of the contract where it refers to the equipment. Yes. Right? I think that's where Your Honor is going. That the list of items under equipment includes the PBX system. It doesn't say just the PBX. It doesn't say just the cables. It doesn't say just the cross-connects, et cetera, et cetera. I'm trying to understand this too because I'm trying to quantify what adds up to $698,000. So your client had this sophisticated system that he created for this special club. And you're saying that when the contract was not renewed with him because that system still stayed with the club necessarily, that they owed you for the system. Correct, Your Honor. And that system is what – how much was that worth? $600,000 approximately. Okay. So I guess my question is if it is the system as a whole, then hadn't they already paid for that? I mean, through entering into the 93 contract and the 99 contract, hadn't they already bought the system as a whole? And could it even be resold on the market to anybody else? Because what I think you're saying – you're trying to say this is a physical thing, but really what you're saying is his intellectual property, his idea for putting in this system, which is not a claim that's in this case at the point that it goes to the jury. Yes, Your Honor. So is that what we're talking about? We are talking about the system. But he can't take it back. The system's there. No, he can't take it. And he did it. He bargained for them through these contracts and got paid to put in this system. He got paid for his labor to put in the system, but he did not – he did not give up his rights to the system itself. I mean, he got paid his labor to put it together. But he has no rights to them, according to the – and that wasn't one of the claims in front of the jury. Our position is that the breach of contract claim, the conversion claim, and the quantum merit claim are all based upon the use of the system. And in particular, the use of the – the keeping and the use of the translations card, which is the heart of the system. Judge Leiber pointed out that there was no specific evidence regarding the – So what's the value? Was there evidence of the fair market value of the translation cards? Even if you were right about use or return or that stuff, which is arguable. But there isn't any. There isn't any, Your Honor. I have to admit there isn't any specific evidence. And one of the reasons why there isn't any is that the trial judge precluded Mr. Philipson from testifying as to that. And that's one of the arguments in our brief. Take it back to where we started. Sorry. Had Mr. Philipson been permitted to testify, he would have given the evidence of the value of the translations card. So working with the cards that they've been dealt with. And the other one was excluded. Yes. Was evidence of Hennage's refusal to pay for a caller ID and an ISDN line and DJN service. That also was excluded, Your Honor. Well, I don't know that you got any appeal with respect to exclusion of evidence having to do with value of the translation cards. Do you? I believe that we made that argument, Your Honor. Okay. Okay. Okay. If you would like to reserve some time, you may. Yes. Thank you. Good morning, Your Honor. Cheryl Orr on behalf of the Vintage Club Master Association and Arthur Allen. There can be no support for the jury verdict in this case based upon breach of contract. The contract specifically states in paragraph 111 what equipment with a capital E has to be returned at the end of the contract term. And that in connection with paragraph 34 talks about that ownership retained in that equipment. And that equipment is specifically defined as the PBX, the 2.5 KVA power conditioners, the emergency power failure panel, the video conferencing system, the voicemail system, and the billing software. Mr. Now, the primary witness for Telemasters, I'm trying to complete. Philipson. Philipson. There, thanks. He actually testified that everything on that list was returned to him except for the emergency power failure panels. And according to him, they have a fair market value, or he describes a value of $4,000 to $5,000 for those panels. So that's the only evidence of an unreturned piece of equipment with a capital E that had any value. The jury in this case had to be, was instructed that they had to determine the fair market value of every piece of equipment that wasn't returned. And that's the only piece of equipment that wasn't returned. There was another piece of equipment, some power, no, that's not the power transfer. The cables, the surge suppressors. But the evidence was submitted that the Vintage Club advised Mr. Philipson that they were available for pickup and he could come and pick them up. He chose not to pick them up. So there can be no evidence of breach of contract or conversion of those items when he consciously chose to forego returning or picking up those items. So what about this argument as to the system as a whole? Well, that's the thing. Contract doesn't talk about any intellectual property rights. Okay, so that's breach of contract. That's breach of contract. But they also talked about quantum Marowit. Well, on the quantum Marowit, their only argument in their opening brief on the quantum Marowit theory is that they were entitled to recover the cost of the cable pair records and creation of the cable pair records. And the evidence at trial was that the cable pair records were part of the 1993 contract. And the evidence was that Mr. Philipson thought, based upon representations made by telemasters, that there were adequate cable pair records that would indicate that he could put together the system. And it turned out that those cable pair records were either inadequate or not there. And he had to do the cable pair record sequencing again. And he testified that that expense under the 1993 contract was on his own dime. And he bore the risk or assumed the risk of that extra cost under the 1993 contract. Then he came back after the fact. And I think the testimony regarding his own dime appears at the 12-1307 reporter's transcript, page 216. He also then wrote a letter subsequently, April 7, 1995, which is Exhibit 10-06, and tried to get the Vintage Club to pay for the cable pair records and the work that he had previously done under the 1993 contract. But the club declined to pay for that. He then negotiates a new contract, the 1999 contract. There is no negotiation in the 1999 contract for extra compensation for the cable pair records. And, in fact, if you look at paragraphs 2.13, 2.321, there is a specific part of the contract that says if there are insufficient cable pair records to get to one of the end user's homes from the end of the box – I'm not very good with all this technical stuff – but from the end of the thing, the cable junction to the home of the person, that they would then install the cable connection at time and labor cost. And that's specifically in the agreement. So the concept is there's no extra compensation due under the contract. There's no conversion of these cable pair records that were paid for in connection with the 1993 contract. Now, wait. Just so that I'm clear here, or sort of less muddied, we have an appeal and a cross-appeal. Yes. Now, your argument on the cross-appeal. The argument that the judge, when he was looking at the damages, the only element of damages that was actually proven up with any certainty was $4,000 to $5,000 for those power transfer panels. That's the only evidence of actual damage of any one of these pieces of capital E equipment that needed to be returned that wasn't necessarily returned. Okay. So the damages that were awarded eventually was, what, $35,000? $35,000. And we submit if the award should never have been more than $5,000 and we get the set-off for the Digital Street settlement of $30,000, the judgment should have been zero. Well, but the court said it got to the $65,000. The court got to the $65,000. I'm sorry. I'm getting used to my glasses, and this is very difficult going back and forth. But the $65,000 was reduced because the court said, well, this testimony about the $200,000 for the cable. I understand the set-off. Cross-connect cables. They were cross-connect cables that were allegedly part of the jury instruction for conversion. The problem with that is, again, the cross-connect cables were not listed on the schedule of equipment defined in the 1999 contract. So the judge was giving them the benefit of the doubt based upon this testimony of the cross-connect cables, but that wasn't even one of the pieces of property that should have been actually returned. It wasn't identified as that piece of equipment. With respect to the quantum merit theory, they can't recover under the quantum merit theory because even if you took into account the cable pair records, their testimony of Mr. Ramsey is that the cost of doing that when he did it for them back in 1990s was only $98,000. So you can't get an award of $698,000 sustained on Ramsey's testimony that the cable pair records that we did back in 1993 under that contract was only $98,000. So we were submitting on our cross-appeal that the only actual evidence of fair market value of any unreturned equipment with a capital E was that testimony of $4,000 to $5,000 and nothing more. There's some disconnect regarding this big video monitor. Mr. Phillipson testified about a video conferencing system and how it was worth a total of $20,000, but that was the total of the system. He never testified that that piece of the system or that whole video conferencing system wasn't returned. He only testified as to specific items that were not returned, and there might be a monitor on the special instruction for conversion, but it doesn't – it wasn't – there was no testimony about that monitor at all. So I think there's a complete disconnect between if you try to add up the damages on the breach of contract cause of action. Plus, the other problem with that is the breach of contract cause of action in the Second Amendment complaint only talks about failure to pay for the reasonable use of intellectual property. It doesn't even talk about equipment or, you know, cables or anything like that. It was limited to the intellectual property claim. How is this case in Federal court? Because – Copyright. Because of the copyright claims. And that's, Your Honor, why we submit that we're entitled to our attorney's fees. All the copyright claims were knocked out before this case ever went to the jury. They were just based upon blank forms from other manufacturers of the PBX and other internal components of the system without any other additional information filled in. He did create, I guess – I mean, I guess he did create the system, and he might have been able to get it copyrighted. I don't know. I don't know. But the copyright claims, he didn't even apply for the copyright until after he was terminated and the contract was bid out to Digital Street. I personally, Mr. Allen, had no idea that there was an action for infringement based upon some copyright claim because they hadn't even made the copyright filing until a month after the system was replaced. The contract, if they wanted to negotiate a contract that dealt with intellectual property issues, they had Louis Brisbois as their counsel negotiating this contract. They could have put terms into the contract that provided for a reasonable license or use of intellectual property. They didn't do that. The contract says what it says, and it should have been enforced. And they can't get damages based upon smoke and mirrors. And that's why, in this case, we submit we want on all of the infringement causes of action. We should have been awarded our attorney's fees because we knocked everything out before they even went to judgment. And what did they get? They got a little tiny judgment based upon obsolete pieces of hardware and wires that mean nothing that can't really be sold to anyone for any amount of real money. The value of the system was that he installed this so that he could get paid on a monthly basis for the telephone system when it was in operation at the club. He got paid during the course of the contract. It had some value to Digital Streets, apparently, that Digital Streets didn't have to invent its own system when it came in. There was an existing system that it could use and then contract with you. Well, Digital Streets settled out of the case. Right. To the extent we're talking about the other remaining defendants, the question is what is in the contract between the parties? And what is the question of unjust enrichment or quantum merit, if you look at that, the only issue on appeal is this cable pair record. The record is clear on that as to when the cable pairs were created and the estimated amount of the expert as to how much the cable pair cost. And it doesn't go past $98,000. It can't support the verdict of $698,000. And Your Honor is right in terms of this estimate of the value of $500,000 and $600,000. That was the system as a whole. But he got back the PBX. He testified he got back the PBX with the translation card. It works. Now, it won't necessarily work for anybody else until he reprograms it, but he testified it has a value of $150,000. So he has a system, he knows how to program it, and he can provide it to a future client in the future. Let me make sure I understand your argument that you're entitled to attorney's fees because you're the prevailing party. Is that argument because you prevailed on the copyright, on the intellectual property claim? Two arguments. One, copyright law on the basis of we prevailed on all the copyright infringement claims and we should have been entitled to our fees on that basis. And second, if you look at California law, comparing the litigation objectives, the $6 million in damages, all of these crazy intellectual property claims, infringement claims, conversion claims, and you look at the whole host of what was requested, why it was in federal court, and what they actually obtained on their breach of contract claim, which wasn't even their pleaded breach of contract claim, then you see that we basically were the winners here. Let me clarify something on that, too. I was unclear whether your position is that because you won on the copyright claim, you therefore should be deemed the prevailing party on all claims, or whether your position is the attorney's fees ought to be diced and sliced such that you would recover fees on the copyright claim but not on the others. Well, I think in this case, because all the claims were interwoven and so difficult to parse out because there were claims that were the breach of contract for stealing the intellectual property. They're all out of the same bundle. Stealing the intellectual property, converting the intellectual property, it was very difficult throughout the whole course of litigation to parse them out, and the defense was all interrelated. So we would submit that to the extent that we are the prevailing parties on the copyright claims, that we should get all of our attorneys' fees. And the court on remand, you know, that may be something that there might be some fees that might be specific to a certain cause of action that might not be recovered, but I would imagine that that would be within the scope of the trial court's discretion on remand. Kennedy. If I may, Your Honor. If I may, Your Honor.  If I may. I apologize. You may be back in another five years, if that's the case. Are there any further questions? Thank you, Your Honor. If I may,�를 No. No, that's it. Oh, okay. If you don't get the server bottle, or I don't. Your Honors, everything was not returned. We did not get both copies of the translation card. You only need one translation card to run the system. Judge Wardlaw, you're absolutely right. Digital Streets and the Vintage Club reaped a tremendous advantage by taking the translation cards. By doing so, they were able to go to a cheaper vendor. They didn't have to rebuild the entire infrastructure. They just copied their guide, testified that we copied the card because it was the cheapest, easiest, most efficient way of doing things, and they were able to get the next system, the quote-unquote new system, running overnight. There's no way that that could happen without the translation card. Now, how did they get the card? The evidence at trial showed that Mr. Denault supplied it to Mr. Allen of the Vintage Club. So, the cable pair records, yes, they were worth $98,000. You don't need a contract for a quantum merowick claim. There is more than ample evidence to support the entire $698,000. That would be $600,000 for the whole system plus $98,000 for the cable pair records. But there's absolutely sufficient evidence to support the reduced finding of $65,000. But did the jury hear? I thought that Phillipson evidence was excluded. Did the jury actually hear the Phillipson $600,000? Yes. Yes, they did. Mr. Phillipson testified that the system as a whole was worth approximately $600,000, and there was no objection or nothing from anybody. So, yes, they did hear that. And that's what they took into that jury room with them, Your Honor. That's the figure that they took. He took the $600,000 from Mr. Phillipson and the $98,000 from the other guy who testified about the cable pairs. As to the evidence of a prevailing party, we submit that this is essentially a breach of contract case. Everything stems from the contractual relationship from the two parties. Without a contract, there's no system, there's no case, there's nothing. I'm not standing in front of you today. So under CCP 1033.5, under CCP 1032, we received net monetary recovery, therefore we're the prevailing party. We also are the prevailing party under Civil Code Section 1717. If you look at the Fogarty case, there's no precise formula. It says that the judge was supposed to apply his equitable discretion, and that's what he did in this case when he at least found that Telemasters was the prevailing party in this case. So we would submit on that. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Rymer, Wardlaw